**HILTON HOTELS CORPORATION and Promus Hotel Corporation, Plaintiffs,**

v.

**Lisa DUNNET, James Evans, Jack Ferguson, John Lavin, Stephen Pletcher, Margaret Ann Rhoades, Dick Trueblood, and Raymond Terry, Defendants.**

No. 00–2852 G/V.

United States District Court,
W.D. Tennessee,
Western Division.

Dec. 28, 2002.

Supplemental Order Jan. 21, 2003.

Ted C. Raynor, Promus Legal Dept., Memphis, TN, Russell D. Duncan, James M. Ludwig, Coburn & Schertler, Washington, DC, David A. Thornton, John S. Golwen, Ashley Swain Old, Husch & Eppenberger, LLC, Memphis, TN, for plaintiffs.

Mary L. Wolff, Wolff Ardis, Memphis, TN, Barry Coburn, James M. Ludwig, Coburn & Schertler, Washington, DC, for defendants.

## ORDER DENTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

MCCALLA, District Judge.

Before the Court is the Motion of Plaintiffs, Hilton Hotels Corporation and Promus Hotel Corporation, for Summary Judgment Pursuant to Fed.R.Civ.P. 56, filed February 15, 2002. Defendants responded in opposition on August 13, 2002. Plaintiffs filed a reply on October 2, 2002. Additionally, the Court held a teleconference in this matter on October 4, 2002, at which counsel for both parties were given an opportunity to be heard on the motion for summary judgment. For the following reasons, the Court DENIES Plaintiffs' motion for summary judgment.

## I. BACKGROUND

Plaintiffs Hilton Hotels Corporation ("Hilton") and Promus Hotel Corporation ("Promus") (collectively, "Plaintiffs") originally filed this action for declaratory judgment. Plaintiffs' Complaint and Amended Complaint request a declaration that Plaintiffs had the right to terminate and/or cash out certain under water options issued pursuant to two equity participation plans. Defendants/Counter–Plaintiffs (collectively, "Counter–Plaintiffs") filed an Answer and Counterclaim asserting that the Plaintiffs improperly canceled their options and requesting compensation for the canceled options.

Counter–Plaintiffs were all employed by Doubletree Corporation ("Doubletree") for varying amounts of time through 1997. While they were employed with Doubletree, each Counter–Plaintiff received Doubletree stock options pursuant to The 1994 Equity Participation Plan of Doubletree Corporation (the "Doubletree Plan"). On December 19, 1997, Doubletree merged into Promus and each Counter–Plaintiff continued to work for Promus for a period of time. Promus assumed all of the terms and conditions of options issued under the Doubletree Plan. While Counter–Plaintiffs were employed with Promus, they each received additional Promus stock options pursuant to The 1997 Equity Participation Plan of Parent Holding Corp. (to be known as Promus Hotel Corporation) (the "Promus Plan"). Upon termination of employment, the Doubletree Plan provided that an employee would have three months to exercise their options. The Promus Plan provided for six months in which to exercise any options upon termination of employment.

After the merger with Doubletree, the new Promus entity experienced significant management difficulties. Morale at Promus was very low. The Chief Executive Officers of both Doubletree and Promus could not get along and both decided to leave Promus. Many former Doubletree executives were unhappy because they were forced to commute from their homes in Arizona to work in Memphis. Additionally, the former Doubletree executives had

an incentive to leave Promus because they could trigger severance packages that expired one year after the merger.

Promus, however, wanted to encourage these executives to remain for a short period of time because Promus had hired a new CEO, Norm Blake. The new CEO needed help from these executives during his transition period because he had never worked in the hotel industry before. Accordingly, the Human Resources Committee of the Board of Directors passed a resolution on November 20, 1998 (the "1998 Resolution"), which provided that certain key employees would receive an extra three-year period in which to exercise their under water stock options after they terminated employment with Promus.[1] The 1998 Resolution applied to "employees who are terminated any time prior to June 30, 1999 either (i) without cause or (ii) voluntarily but with the special authorization of the Chief Executive Officer." As each Counter–Plaintiff held a significant number of under water options, the 1998 Resolution was very valuable to them because they would otherwise have had only three or six months to exercise the under water options. Such a short exercise period rendered the options not very valuable.

By written memoranda, Promus' CEO, Norm Blake, approved Counter–Plaintiffs Terry, Evans, Dunnet, Rhoades, Lavin, and Trueblood for coverage under the 1998 Resolution on March 26, 1999, and approved Jack Ferguson for coverage on March 30, 1999 (the "Blake Memoranda"). Counter–Plaintiff Pletcher was fired on July 13, 1999. However, Pletcher and Promus signed a written agreement (the "Pletcher Cessation Agreement"), which provided that he would be covered under the 1998 Resolution.

Towards the end of 1999, Promus engaged in merger discussions with Hilton that ultimately culminated in Hilton acquiring Promus on November 30, 1999. As a condition of the merger, Hilton required that Promus cash out or cancel all outstanding options, including the under water options with a three-year exercise period held by Counter–Plaintiffs.[2] By a side letter to the merger agreement, Hilton and Promus agreed that, in the event cancellation of the options was found legally impermissible, Hilton would assume the consequences.

The number of under water options each Counter–Plaintiff claims has been wrongfully canceled, the plan under which the options were issued, the date the options were received, the date each Counter–Plaintiff resigned, and the last day of employment for each Counter–Plaintiff are as follows:

| Plaintiff | Number of Options at Issue | | Date Received | Date of Resignation | Last Day of Employment |
|---|---|---|---|---|---|
| | Doubletree Plan | Promus Plan | | | |
| Lisa Dunnet | 2,000 | | 05/02/97 | 04/05/99 | 05/05/99 |
| | | 750 | 12/19/97 | | |

1. Under water stock options are those for which the exercise price of the option is greater than the market price of the stock.

2. All options with an exercise price under $38.50 were cashed out because they were in-the-money, while options with an exercise price above $38.50 were canceled because they were under water. In contrast to under water options, in-the-money options have an exercise price that is below the market value of the stock.

| | | | | | |
|---|---|---|---|---|---|
| James Evans | 100,000 | | 11/08/96 | 11/06/98 | unclear from record |
| | | 15,000 | 12/19/97 | | |
| Jack Ferguson | 12,500 | | 05/02/97 | 02/99 | 04/02/99 |
| | | 7,500 | 12/19/97 | | |
| John Lavin | 7,500 | | 05/02/97 | 02/01/99 | 04/30/99 |
| | | 2,250 | 12/19/97 | | |
| Margaret Ann Rhoades | 80,000 | | 11/18/96 | 2/99 or 3/99 | 03/31/99 |
| | | 18,750 | 12/19/97 | | |
| Dick Trueblood | 50,000 | | 05/02/97 | unclear from record | 05/07/99 |
| | | 12,500 | 12/19/97 | | |
| Raymond Terry | 35,000 | | 05/02/97 | 12/98 | 01/31/99 |
| | | 7,500 | 12/19/97 | | |
| Stephen Pletcher | 80,000 | | 11/18/96 | N/A | 07/13/99 |
| | | 12,500 | 12/19/97 | | |

Neither party disputes that all of the options listed above were under water at the time they were canceled (i.e. the exercise price for the options was higher than the price of $38.50 that Hilton would pay for the shares).

Plaintiffs rely on the terms of the Doubletree and Promus Plans as the source of Promus' right to cancel these under water options. Counter–Plaintiffs base their claim for compensation for these canceled options on theories of breach of contract, quasi-contract/promissory estoppel, and conversion.

Finally, in addition to claims that Promus wrongfully canceled his under water options, Counter–Plaintiff Pletcher also asserts that Promus wrongfully deprived him of the value of certain in-the-money options that he held at the time of the merger with Hilton. Pletcher asserts, and Plaintiffs generally do not dispute, that he attempted to exercise his in-the-money options prior to expiration of the options in December of 1999. However, instead of allowing Pletcher to exercise his options and receive payment, Promus mailed him a release form requiring, in part, that as a condition to being paid for his in-the-money options, Pletcher would have to release any claim to his under water options with a three-year exercise period. Pletcher did not agree to release his under water options and Promus did not pay him for the in-the-money options. In addition to claims listed above, Pletcher also asserts claims of unjust enrichment and fraud with respect to the in-the-money options for which he was not paid.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if ... there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court has explained that the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a

showing, summary judgment is appropriate. *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. ANALYSIS

This case presents many questions of contract law concerning the provisions of the Doubletree and Promus Plans and the amendment thereto. The issues have been well-briefed by both sides. The Court will address each issue raised by the parties separately.

### A. Consideration

■ The preliminary question raised in Plaintiffs' motion is whether the 1998 Resolution, the Blake Memoranda, and the Pletcher Cessation Agreement constitute valid enforceable amendments to the stock options that were supported by adequate consideration.

Plaintiffs argue that Counter–Plaintiffs provided no consideration for the three-year extension because they incurred no detriment and Promus gained no benefit as a result of the 1998 Resolution and because Counter–Plaintiffs did not rely upon the 1998 Resolution in making their respective decisions as to when they would resign from Promus. Conversely, Counter–Plaintiffs assert that they incurred a detriment by continuing in their employment with Promus after Promus' Board of Directors passed the 1998 Resolution. Counter–Plaintiffs point out that several of

them were required to commute every week from Arizona to Memphis to work and they also deferred valuable severance packages in order to stay and earn the three-year extension of their underwater options. Counter–Plaintiffs further assert that they provided a benefit to Promus by continuing in their employment with Promus during the transition of a new Chief Executive Officer.

Under Delaware Law (which applies in this case pursuant to choice of law clauses in both the Promus and Doubletree Plans), "[v]alid consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance, or return promise bargained for and given in exchange for the original promise." *Liafail, Inc. v. Learning 2000, Inc.,* 2002 WL 31667861, *5, 2002 U.S. Dist. LEXIS 22620, *15 (D.Del. Nov. 25, 2002); *First Mortgage Co. v. Federal Leasing Corp.,* 456 A.2d 794, 795–796 (Del. 1982). Consideration for stock options is often the employee's agreement to continue to work for the employer. *Pogostin v. Rice,* 480 A.2d 619, 625 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000); *Zupnick v. Goizueta,* 698 A.2d 384, 388 (Del.Ch.1997).

It is clear to the Court that in this case, the amendment to the exercise period of the options was supported by valid enforceable consideration. Each Counter–Plaintiff continued to work for Promus for a period of time after the 1998 Resolution was passed, thus incurring a detriment and providing a benefit to Promus. Many Counter–Plaintiffs continued to commute from Arizona to Memphis during this time, (Rhodes Dep. at 100), and opted to defer the benefits of their severance packages in order to remain with Promus through the short transition of the new Chief Executive Officer.[3] This evidence alone creates a

---

**3.** There may be some question as to the detriment suffered by Counter–Plaintiff Evans, or the benefit to the Corporation in his case, as he tendered his resignation two days before the 1998 Resolution. His ultimate departure date from Promus is unclear from the record.

sufficient showing of detriment to Counter–Plaintiffs to defeat summary judgment on the issue of consideration. Additionally, former Promus General Counsel J. Kendall Huber testified as to the benefit Counter–Plaintiffs provided to Promus:

Q. What your [sic] testifying to, sir, is that the Resolution that the Board passed in 1998, was passed with the idea to keep people at the company for a short while [sic] Mr. Blake was transitioning; is that correct?

A. Yes.

Q. And so what the people received, based on your earlier testimony, for staying with the company and foregoing those golden parachutes at that time, was the right to be covered by the Board Resolution?

A. I should make clear, the right to defer the payment under the golden parachute. They didn't forego that, they deferred it.

Q. And in consideration of that, they were granted whatever benefits the Board Resolution of November 1998 purported to extend; is that correct?

A. Yes, sir.

(Huber Dep. 10/5/01 at 137–138.) This provides evidence that Promus viewed Counter–Plaintiffs' service to the corporation as a benefit.

Finally, the Court is not persuaded by Plaintiffs' argument that consideration is lacking in this case. Plaintiffs assert that Counter–Plaintiffs did not rely on the promise of an extended options exercise period when each made a decision to remain with Promus or to resign. However, reliance is not the appropriate test for consideration, therefore, this argument is unavailing.

However, the Court can not say as a matter of law that he furnished no consideration in this case, particularly in light of the fact that the

**B. Incorporation of the Promus and Doubletree Plan Documents into the 1998 Resolution**

■ Having found that the amendment was supported by valid consideration, the next question before the Court is whether the terms of the Promus and Doubletree Plans are incorporated into the November 1998 Resolution. Counter–Plaintiffs contend that the 1998 Resolution was a stand alone contract granting them a three-year period of time in which to exercise their under water options. Therefore, Counter–Plaintiffs argue, the terms of the Promus and Doubletree Plans, including the change in control provisions contained in Sections 10.3 and 10.4, are not incorporated into the 1998 Resolution. By contrast, Plaintiffs contend that the terms of the Promus and Doubletree Plans are incorporated into the 1998 Resolution for three reasons. First, Plaintiffs contend that the stock options affected by the 1998 Resolution were originally issued pursuant to the Promus and Doubletree Plans, which are, therefore, implicitly incorporated into the 1998 Resolution. Second, Plaintiffs argue that the recitals contained in the 1998 Resolution explicitly reference and incorporate the terms of the Promus and Doubletree Plans. Finally, Plaintiffs assert that the actual option award certificates expressly incorporate the terms of the Promus and Doubletree Plans.

For the reasons substantially stated in Parts I.A., I.B., and I.C. of the Reply of Plaintiffs to Memorandum of Counter–Plaintiffs in Opposition to Motion for Summary Judgment, the Court finds that the 1998 Resolution incorporates the terms of the Promus and Doubletree Plans.. Furthermore, the Court notes that the 1998 Resolution could have no effect without the

Chief Executive Officer subsequently approved him for coverage under the 1998 Resolution.

inclusion of the Plans because the 1998 Resolution merely creates a three-year period in which to exercise the options, but does not contain any other essential terms, such as how the options can be exercised or at what price. Without incorporating the terms of the Plans, the 1998 Resolution is useless.

### C. Interpretation of Sections 10.2, 10.3, and 10.4 of the Promus and Doubletree Plans

■ Having determined that the 1998 Resolution incorporates the terms of the Promus and Doubletree Plans, the Court now reaches the central dispute in this case: whether the terms of the Plans allowed Promus to cancel under water options without providing any compensation for them.

As a preliminary matter, the Court must address what degree of deference should be given to the Board of Directors in this case. Both Plans provide that the Human Resources Committee (a committee of the Board of Directors) shall have the power to interpret the Plan and the agreements pursuant to which options are issued. (Doubletree Plan § 9.2; Promus Plan § 9.2.)

Plaintiffs assert that, where the stock option plan provides that the Board has authority to interpret the plan, review of the Board of Directors' interpretation of the plan is limited to a determination of whether the Board has "been arbitrary or acted in bad faith or in a fraudulent manner." *McIntyre v. Philadelphia Suburban Corp.*, 90 F.Supp.2d 596, 600 (E.D.Pa. 2000). In opposition, Counter–Plaintiffs maintain that one of the parties to a dispute should not be the arbiter of the dispute. *Ellis v. Emhart Mfg. Co.*, 150 Conn. 501, 191 A.2d 546, 549 (1963) ("Where a corporate employer declares a plan to be within the absolute discretion of the directors, the court nevertheless will interpret the plan so as to give effect to its general purposes, and the employer cannot defeat the employees' reasonable expectations of receiving the promised reward.") The Court has been unable to locate a Delaware decision on this point. Nevertheless, even assuming that Plaintiffs propose the appropriate standard, the Court would find it appropriate to review the Board's decision here.

There is abundant evidence in the record that throughout the merger discussions with Hilton, Promus executives believed that Hilton should assume the obligations of the under water options. At the eleventh hour, when it became clear that this issue would be a deal-breaker for Hilton, which demanded cancellation of the under water options, Promus relented and agreed to cancel the options. Promus then requested a side letter to protect itself in the event such an action was legally unenforceable. (Huber Dep. 10/5/01 at 169.) Promus' former general counsel, Jay Huber, later testified that the reason Promus requested the side letter was that the necessary research had not been done to determine whether the under water options could be canceled. (Huber Dep. 6/25/02 Vol. 2 at 26.) This evidence provides a sufficient showing of arbitrariness to permit the Court to review the Board's decision to cancel under water options at the time of the merger.

Moving to the central dispute in the case, Plaintiffs argue that Sections 10.3 and 10.4 of the Doubletree Plan and Section 10.3 of the Promus Plan unambiguously gave Promus the right to terminate the Plans and cancel any under water options in the event of a merger. Counter–Plaintiffs argue that the language contained in Section 10.2 of each Plan protects the option holders and prevents Promus from unilaterally canceling under water options without compensation.

The Doubletree Plan provides in pertinent part:

10.2 *Amendment, Suspension or Termination of this Plan.* This Plan may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Committee .... No amendment, suspension or termination of this Plan shall, without the consent of the holder of Options ..., alter or impair any rights or obligations under any Options ..., unless the award itself otherwise expressly so provides.

10.3 *Changes in Common Stock or Assets of the Company.* In the event that the outstanding shares of Common Stock are hereafter changed into or exchanged for cash or a different number or kind of shares or other securities of the Company, or of another corporation, by reason of ... merger ..., appropriate adjustments shall be made by the Committee in the number and kind of shares for which Options ... may be granted.

    *      *      *      *      *      *

Notwithstanding the foregoing, in the event of such a ... merger ..., the Company will have the right to terminate this Plan as of the date of the exchange or conversion, in which case all options, rights and other awards under this Plan shall become the right to receive such cash, securities or other property, net of any applicable exercise price.

10.4 *Merger of the Company.* In the event of the merger or consolidation of the Company with or into another corporation ...:

  (a) At the discretion of the Committee ..., the terms of an Option ... may provide that it cannot be exercised after such event.

  (b) In its discretion, and on such terms and conditions as it deems appropriate, the Committee ... may provide ... that, for a specified period of time prior to such event, such Option ... shall be exercisable as to all shares covered thereby ....

  (c) In its discretion, and on such terms and conditions as it deems appropriate, the Committee ... may provide that upon such event such Option ... shall be substituted for by similar options, rights or awards covering the stock of the successor corporation ... with appropriate adjustments as to the number and kind of shares and prices.

The Promus Plan provides in relevant part:

10.2 *Amendment, Suspension or Termination of the Plan.* Except as otherwise provided in this Section 10.2, the Plan may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Board or the Committee .... No amendment, suspension or termination of the Plan shall, without the consent of the Holder alter or impair any rights or obligations under any Award theretofore granted or awarded, unless the Award itself otherwise expressly so provides.

10.3 *Changes in Common Stock or Assets of the Company, Acquisition or Liquidation of the Company and Other Corporate Events.*

  (b) [I]n the event of any Corporate Transaction ... the Committee ... in its discretion is hereby authorized to take any one or more of the following actions whenever the Committee ... determines that such action is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan or with respect to any option, right or other award under the Plan, to facilitate such transactions or events ...:

(i) In its sole and absolute discretion, and on such terms and conditions as it deems appropriate, the Committee ... may provide ... for either the purchase of any such Award for an amount of cash equal to the amount that could have been attained upon the exercise of such Award or realization of the Holder's rights had such Award been currently exercisable or payable or fully vested or the replacement of such Award with other rights or property selected by the Committee ...;

(ii) In its sole and absolute discretion, the Committee ... may provide ... that it cannot vest, be exercised or become payable after such event;

(iii) In its sole and absolute discretion, and on such terms and conditions as it deems appropriate, the Committee ... may provide ... that for a specified period of time prior to such transaction or event, such award shall be exercisable as to all shares covered thereby—..;

(iv) In its sole and absolute discretion, and on such terms and conditions as it deems appropriate, the Committee ... may provide ... that upon such event, such Award be assumed by the successor or survivor corporation ... or shall be substituted for by similar options, rights or awards covering the stock of the successor or survivor corporation ....

■ Under Delaware law, the proper interpretation of language in a contract is treated as a question of law in the trial court. *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991). "The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract." *Sanders v. Wang,* 1999 WL 1044880, *5, 1999 Del. Ch. Lexis 203, *17 (Del. Nov. 8,

1999). "Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear literal meaning of the words. One begins to analyze the terms by determining whether provisions are reasonably subject to more than one interpretation. Toward that end, contract language is not rendered ambiguous simply because the parties in litigation differ concerning its meaning. Nor is it rendered ambiguous simply because the parties do not agree upon its proper construction. A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.* (internal quotes and citations omitted).

■ The Court need not finally decide what interpretation the terms of the Plans should be given on Plaintiffs' motion for summary judgment. The Court need only decide whether Plaintiffs' position is unambiguously correct. The Court finds that the language of the Doubletree and Promus Plans do not unambiguously support Plaintiff's interpretation in this case. Indeed, it appears to the Court that Counter–Plaintiffs' interpretation may be the more reasonable one.

Plaintiffs have advanced the idea that because the options were under water at the time of the merger, they were worthless. If the under water options have no value it would mean that, when Promus awarded each Counter–Plaintiff a three-year extension in which to exercise their options, Promus gave nothing of value to Counter–Plaintiffs in exchange for their continued service during the transition of a new Chief Executive Officer. Such an interpretation renders the 1998 Resolution meaningless and is not favored by the Court.[4] *Seabreak Homeowners Assoc. v.*

---

4. Furthermore, finance teaches that money has value over time. Similarly, under water

options have measurable value based on the likelihood that they may move into the money

*Gresser,* 517 A.2d 263, 269 (Del.Ch.1986) ("a contract must be construed ... [to avoid] a construction which would render any of [the] provisions illusory or meaningless").

Moreover, nowhere do the Doubletree and Promus Plans expressly provide that under water options may be terminated without reimbursement for their value, which is important in light of the peculiar facts of this case.[5] Both Sections 10.3 and 10.4 imply that they will be exchanged for value, whether in the form of "cash, securities, or other property, net of any applicable exercise price", (Doubletree Plan § 10.3), or "for an amount of cash equal to the amount that could have been attained upon the exercise of such Award ... or the replacement of such award with other rights or property", (Promus Plan § 10.3(b)(1)). As Mr. Duncan, counsel for Counter–Plaintiffs, noted during the October 4, 2002 teleconference in this case, Section 10.3 in each Plan is designed to act as a shield to protect employees in the event of a merger, while still allowing the company to complete the merger. What Plaintiffs have attempted to do in this case is to use the change of control provisions as a sword to harm the employees. (Transcript of October 4, 2002 Teleconference at 10.)

Further, both the Doubletree and Promus Plans contain a provision specifically designed to protect the option holder from any action by the Board of Directors that would alter or impair the holder's rights under the Plans. (Doubletree Plan § 10.2; Promus Plan § 10.2.) Section 10.2 of each Plan should be read in conjunction with Sections 10.3, 10.4, and the 1998 Resolu-

tion. *Agranoff v. Miller,* 1999 Del. Ch. LEXIS 78, *49 (Del. Ch. Apr. 9, 1999) ("courts will interpret a contract in a manner that gives effect to all of its provisions"). When all provisions are read together, it is clear that Promus' Board of Directors could not cancel the under water options without compensation in this case because to do so would alter or impair the rights of option holders in violation of Section 10.2 and in contravention to the rights specifically granted in the 1998 Resolution.

Plaintiffs' reliance on *Raybuck v. USX, Inc.,* 961 F.2d 484 (4th Cir.1992), is not persuasive to the Court. In *Raybuck,* the Court of Appeals for the Fourth Circuit considered whether USX breached a contract with Raybuck when it canceled his options after he went to work for a competitor. The court's opinion indicates that the USX Board of Directors had the authority, pursuant to the stock option plan, to cancel any *outstanding options* "in the best interest of the corporation." By contrast here, the Promus and Doubletree Plans permit the Board of Directors to terminate *the Plans* to facilitate a merger. However, neither Plan contains a clause giving the Board of Directors an unfettered right to cancel *outstanding options* without appropriate compensation. Therefore, *Raybuck* is inapplicable.

The Court also finds it unlikely that business executives, such as Counter–Plaintiffs, would contract to extend the exercise period for under water options for three years with the understanding that the options could be taken away from them without payment or their consent in the event of a merger less than one year later. *See Hermanowski v. Acton Corp.,* 580

---

at some point prior to their expiration. If exercised while under water, the options would net the holders no benefit, but the under water options themselves had inherent value because they could be exercised in the future.

5. It must, of course, always be kept in mind that the contract terms must also be read in conjunction with the 1998 Resolution of the Board of Directors.

F.Supp. 140, 143 (E.D.N.Y.1983) (rejecting Acton's argument that it could cancel Hermanowski's stock options, for which he negotiated a five-year exercise period, "where it would require me to believe that the plaintiff, a sophisticated and experienced businessman ... released his rights under an unexpired employment contract on which he would receive approximately $100,000 for $25,000 plus *an illusory stock option*") (emphasis added).

Finally, "[i]t is well settled that in judicial interpretation of contract language, language will be interpreted most strongly against the party using it." *Andersen v. State Dep't of Admin. Serv.,* 612 A.2d 157 (Del.1992) (citation omitted). Therefore, the Court should construe the Plans against Promus, who drafted the Plans and is attempting to eliminate Counter–Plaintiffs rights under the Plans. If the Board of Directors had intended to reserve the right to cancel outstanding options without payment, it could have expressly provided for that right in the Plans. However, the Plans contain no unequivocal language granting Promus the right to cancel outstanding options without compensation. The Court is unwilling to read such strong language into the terms of the Plans without a clear statement. Accordingly, the language of the Plans does not unambiguously support Plaintiffs' position and Plaintiffs' motion for summary judgment must be DENIED on the breach of contract claim.[6]

### D. Conversion Claim

Plaintiffs also argue that they should be granted summary judgment as to Counter–Plaintiffs' claim for conversion. Conversion is an "act of dominion wrongfully exerted over the property of another,

in denial of his right, or inconsistent with it." *Arnold v. Society for Sav. Bancorp.,* 678 A.2d 533, 536 (Del.1996) (citation omitted). Plaintiffs assert that Counter–Plaintiffs had no contractual or quasi-contractual ownership rights in the options and, therefore, there could be no conversion. Further, Plaintiffs assert that Promus' cancellation of the options was not wrongful. Counter–Plaintiffs did not respond to this argument in their memorandum.

Notwithstanding the fact that Counter–Plaintiffs failed to respond to this argument, the Court declines to grant summary judgment as to this claim. As discussed above in part III.C., the under water options constituted valuable property belonging to Counter–Plaintiffs. Nothing in either of the Plans unambiguously permits Promus, Doubletree, or a successor company to unilaterally take that property away without payment or the recipient's consent. Accordingly, Plaintiff's motion for summary judgment on the claim of conversion must be DENIED as well.

### E. Counter–Plaintiff Pletcher's Fraud Claim

Stephen Pletcher is the only party who asserts a claim of fraud in this case. Plaintiffs have moved for summary judgment on Pletcher's counterclaim of fraud, but have restricted their motion to Pletcher's claim of fraud with respect to his under water options. Footnote ten of Plaintiffs' motion states, "Because it is undisputed that plaintiffs agreed to pay Defendant Stephen Pletcher for the cash out of his 'in the money' options if he releases his claims for 'underwater options,' this Memorandum does not address any of De-

---

**6.** As the Court has already found that the amendment was supported by valid consideration, the terms of the Plans are incorporated into the amendment, and the Plans did not unambiguously give Promus a right to cancel the options without compensation, it is unnecessary for the Court to address the issue of promissory estoppel.

fendant Pletcher's claims for his 'in the money' options." Plaintiffs specifically have not moved for summary judgment as to Pletcher's fraud and unjust enrichment claims regarding his in-the-money options.

Counter–Plaintiffs response to the motion for summary judgment makes clear that Pletcher asserts a single claim of fraud regarding his in-the-money options. Pletcher does not assert a claim of fraud with respect to his under water options. Therefore, Plaintiffs' motion for summary judgment on Pletcher's claim of fraud regarding his under water options is moot and is hereby DENIED.

## IV   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED as to all claims.

### SUPPLEMENTAL ORDER ON MOTION FOR SUMMARY JUDGMENT

On December 28, 2002, the Court issued its Order Denying Plaintiffs' Motion for Summary Judgment. After receiving Plaintiffs' January 9, 2003 motion requesting an order allowing an interlocutory appeal, the Court has decided to more fully elaborate on the standard of review that the Court applied to the Board of Directors' decision to cancel the under water options at issue in this case. Accordingly, the Court is issuing this supplement to its order.

In their initial motion for summary judgment, Plaintiffs reasoned that under both Plans the Board was granted the power to interpret the terms of the Plans. Accordingly, Plaintiffs urged the Court to adopt a standard that only allows the Court to review the Board of Directors' decision where there is evidence that the decision was made arbitrarily, in bad faith, or in a fraudulent manner. By contrast, Counter–Plaintiffs essentially urged the Court to examine the Board of Directors' decision using a *de novo* standard of review because, Counter–Plaintiffs argue, one of the parties to a dispute should not be the arbiter of that dispute.

■ In their motion requesting an interlocutory appeal, Plaintiffs now raise the issue of the business judgment rule. Plaintiffs assert that the Board of Directors' decision should be reviewed under the heightened standard known as the business judgment rule, which requires a court to assume the directors acted in the best interests of the corporation.[1]

As the Court noted in its December 28, 2002 order, the Court has been unable to locate a Delaware decision discussing the standard of review that should be applied to a board of directors' decision regarding the interpretation of an employee stock option plan. Similarly, the parties have also been unable to direct the Court to an applicable Delaware decision. Case law from other courts is sparse. Absent a

[1.] The Court notes preliminarily that the business judgment rule would not apply to this case. The purpose of the business judgment rule is to prevent shareholders from second-guessing the decisions directors make on behalf of a corporation. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984) ("It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.") It arises mainly in shareholder derivative suits or lawsuits alleging that the directors breached their fiduciary duty to the corporation. *Id.* In that regard, the business judgment rule would be an appropriate benchmark had Promus' shareholders sued the Board in connection with the merger with Hilton. However, in this case the question is not whether the directors acted in the best interest of the corporation when they canceled the options (which, it appears, they did). The question is whether they properly administered the stock option plans with respect to the optionees' rights under the plans.

definitive case on this issue, the Court has examined the general principles of Delaware law and other similar types of contracts for guidance in determining what the Delaware Supreme Court would likely decide in this situation.

In particular, the Court has found contracts arising under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, to be instructive. Similar questions regarding the standard of review often arise under ERISA where a benefits plan provides the administrator with the power to interpret the plan.

In this regard, the Court has found *Goldstein v. Johnson & Johnson*, 251 F.3d 433 (3d Cir.2001), very helpful. In *Goldstein*, the Third Circuit analyzed the standard of review that should be used when a court is presented with an ERISA "top hat" plan that provides for the administrator to interpret the terms of the plan.[2] *Id.* at 442. A top hat plan differs from the typical ERISA plan because a top hat plan applies only to highly paid executives who are in a strong bargaining position relative to their employers and because the administrator is not considered the fiduciary of the plan. *Id.* According to the Third Circuit, top hat plans are "akin to unilateral contracts." *Id.* In these ways, an ERISA top hat plan resembles the stock option plan in this case, as modified by the 1998 Resolution.[3]

In *Goldstein*, the Third Circuit determined that although "discretion" may be explicitly written into a top hat plan docu-ment, the plan should be treated as a unilateral contract and "neither party's interpretation should be given precedence over the other's, except in accordance with ordinary contract principles." *Id.* at 443. The court went on to state that, in accordance with ordinary contract principles, "where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith—a requirement that includes the duty to exercise the discretion reasonably." *Id.* at 444.[4]

The Court's review of ERISA case law also shows the importance of examining any potential conflict of interest that may arise when a plan administrator interprets the terms of a benefit plan. In *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir.2000), the Third Circuit considered whether an insurance company that both funds and administers a benefits plan is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review. The court determined that a heightened degree of scrutiny was appropriate because of the insurer's financial conflict. *Id.* at 379.

Further, the Delaware Supreme Court has long recognized that where a board of directors faces a conflict of interest in connection with a transaction, a court should more carefully examine the board's decision. *See, e.g., Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (recognizing that directors may act

---

2. Where an ordinary ERISA plan provides for the administrator to interpret the terms of the plan, the Supreme Court has instructed that a denial of benefits should be given deference upon review. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

3. The Court notes that with this decision the Court is not attempting to establish a fiduciary duty on behalf of the Board of Directors as administrators of the stock option plans to optionees under the plans.

4. The court also rejected the idea that such contracts should be voided as unconscionable because the clause granting interpretive discretion essentially designates an interested party as an arbitrator. *Goldstein*, 251 F.3d at 444. The court simply held that the discretion must be exercised reasonably and in good faith. *Id.*

primarily in their own interests when addressing a potential takeover bid and applying "an enhanced duty which calls for *judicial examination at the threshold* before the protections of the business judgment rule may be conferred") (emphasis added). Additionally, the Delaware Supreme Court has protected parties with weak bargaining positions relative to a corporate transaction when those parties rights will be affected by the transaction. *See, e.g., Harman v. Masoneilan Int'l, Inc.,* 442 A.2d 487, 492 (Del.1982) (stating that a majority shareholder and its director designees occupy a fiduciary relationship to the minority shareholders and must establish the transaction's "entire fairness" to the minority shareholders).

Given the above case law and the discretion granted to the Board of Directors in this case, the Court finds it appropriate to adopt the standard of good faith and reasonableness set forth in *Goldstein,* subject to the idea that the Court must review the Board's decision more closely where there is evidence of a conflict of interest or bias.

In this case it appears that Hilton held a controlling position relative to Promus. Promus had no choice but to cancel the options or lose the merger. In this situation, it would be difficult for the Promus Board of Directors to give unbiased consideration to the proper interpretation of the Plans and the special situation of Counter–Plaintiffs, who held a three-year extension pursuant to the 1998 Resolution. The Promus Board of Directors owed an overriding duty of loyalty to the corporation and its shareholders; it had far less obligation to Counter–Plaintiffs, who no longer worked for Promus.[5] Given this

inherent conflict of interest, the Court evaluated more carefully (i.e. less deferentially) the decision to cancel these options.[6]

The Court believes that the Delaware Supreme Court would recognize the conflict and adopt a *Goldstein*-type standard of review under the peculiar facts of this case. It is by utilizing such an analysis that the Court reached the conclusions set forth in the order of December 28, 2002.

---

**5.** The fact that Promus made its decision to cancel the options of former employees holding a special three-year exercise right distinguishes it from the fairly typical situation in which a corporation cancels under water options belonging to current employees in order to complete a merger.

**6.** It should be noted that Plaintiffs' interpretation nullified all rights Counter–Plaintiffs had earned under the Plans and rendered the promise that Promus provided under the 1998 Resolution completely illusory.