These cases indicate that Michigan law would require some affirmative act creating culpability on the part of the insurer in order to hold it to the greater coverage in an earlier policy. At a minimum, they do not support the proposition that an excess insurer who "follows form" is responsible for the misdeeds of the underlying insurer.

The majority concludes that Northfield should be bound "because the 'follow form' linkage between an excess insurer and the primary insurer should logically apply to procedural as well as substantive obligations to their common insured. In effect, an excess insurer who lives by the sword must die by the sword." This does not seem at all logical to me. When an excess insurer opts to "follow form," it is agreeing to insure excess losses for precisely the scope of coverage provided by the underlying insurance – no more, no less. In no way does this imply that the excess insurer accepts responsibility for the underlying insurer's failure to fulfill its legal obligations to their common insured. The insured is in the better position to know what he, she or it has been told about changes from earlier policies. Excess insurance is relatively inexpensive, which is a benefit to the insured. Placing the burden of examining the history of the relationship between the insured and the primary carrier on the excess insurer will require a significant increase in the cost of excess insurance with little benefit to the insureds, most of which are sophisticated businesses, not ordinary consumers.[2]

---

[2]Although I agree that if we ruled against Northfield, Northfield could bring an indemnity action against Federal for the amount it would owe to the insureds as a result of Federal's failure to notify, this does not seem to me a sufficient reason to impose upon Northfield an affirmative obligation to take responsibility for Federal's misconduct.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2003 FED App. 0082P (6th Cir.)
File Name:  03a0082p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

AMWAY DISTRIBUTORS
BENEFITS ASSOCIATION, et al.,
    *Plaintiffs-Appellants,*

    *v.*

NORTHFIELD INSURANCE
COMPANY,
    *Defendant-Appellee.*

No. 01-2091

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 99-00362—Gordon J. Quist, District Judge.

Argued:  December 13, 2002

Decided and Filed:  March 19, 2003

Before:  KENNEDY and GILMAN, Circuit Judges;
SARGUS, District Judge.

---

[*] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

**COUNSEL**

**ARGUED:** J. A. Cragwall, Jr., WARNER, NORCROSS & JUDD, Grand Rapids, Michigan, for Appellants. Larry I. Gramovot, Tampa, Florida, for Appellee. **ON BRIEF:** J. A. Cragwall, Jr., Joseph A. Kuiper, WARNER, NORCROSS & JUDD, Grand Rapids, Michigan, for Appellants. Larry I. Gramovot, Tampa, Florida, James G. Gross, GROSS, NEMETH & SILVERMAN, Detroit, Michigan, Steven B. Galbraith, GALBRAITH & BOOMS, Southfield, Michigan, for Appellee.

GILMAN, J., delivered the opinion of the court, in which SARGUS, D. J., joined. KENNEDY, J. (pp. 13-16), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. Amway Distributors Benefits Association and others (collectively, the insureds) brought a breach of contract claim against their excess liability insurer, Northfield Insurance Company, after Northfield refused to indemnify them for losses associated with the settlement of two copyright infringement lawsuits. Northfield moved for summary judgment, arguing that the insureds' conduct did not meet the narrow definition of "Advertising Injury" that Northfield had incorporated into its policy from the underlying primary policy. Holding that Northfield was not responsible for the failure of the underlying carrier to notify the insureds that the scope of the coverage for "Advertising Injury" had been reduced on policy renewal from that originally provided, the district court granted the motion for summary judgment. The insureds then filed a motion for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, arguing that Northfield

liable for Federal's failure to notify the insureds of the change in the underlying insurance policy.

There is no authority for the proposition that an excess insurer is obligated to inform the insured of a change in the underlying insurance policy. Although it is true that, under Michigan law, a insurer has an affirmative obligation to notify the insured of any change in coverage in a renewal policy, the cases establishing this principle do not support imputing a primary insurer's failure to fulfill its obligation to the excess insurer. In *Koski v. Allstate Ins. Co.*, 539 N.W.2d 561, 563 (Mich. Ct. App. 1995), *rev'd on other grounds*, 572 N.W.2d 636 (1998), the Michigan Court of Appeals held that "[w]here a renewal policy is issued without calling the insured's attention to a reduction in coverage, the insurer is bound to the greater coverage in the earlier policy." The *Koski* court's decision rests primarily on another Michigan Court of Appeals case, *Industro Motive Corp. v. Morris Agency, Inc.*, 256 N.W.2d 607 (Mich. Ct. App. 1977). In *Industro Motive*, the court relies entirely on a modified theory of equitable estoppel to hold that an insurer is bound by the greater coverage in an earlier policy where the renewal contract is issued without calling to the insured's attention a reduction in coverage. It was essential to the *Industro Motive* court that the insurers knew that the insured desired the greater coverage, and represented that such coverage was available. *Id.* at 609. Even if, as the insureds argue, these cases are based on a "contract reformation" rather than an equitable estoppel theory, "contract reformation" requires a showing that the liable party have knowledge of the mistake that produced the inequity, and have taken some action to capitalize on or conceal that mistake. *See, e.g., Retan v. Clark*, 200 Mich. 493, 496 (1922) (holding that a contract may be reformed where negotiations were marked by "a mistake on the part of [one party] and knowledge of the mistake and concealment thereof on the part of the [other party].").

premium remained the same, it was for very different coverage. This is not the usual situation when the insurance company deals directly with its insured in order to renew an existing policy. Where brokers are involved in negotiating the terms of the policy, the rationale for a "renewal rule" such as Michigan's is diminished, since there would be less need to protect unknowing insureds from the passive misrepresentations of their insurers. Fourth, the number of distributors who were additional insureds under the policy changed significantly and the basis on which distributors were covered changed as well. In prior years, all distributors were covered. With this policy only those who elected to do so and paid a separate fee were covered. This substantial change in coverage is not consistent with mere renewal of the previous year's policy. Fifth, the name of the insured entity changed. Again, this type of change is not consistent with mere renewal.[1] I would hold that a policy offered in response to a solicitation that differs so much from previous policies and no longer includes the umbrella coverage which prompted the initial coverage cannot be categorized as a renewal. At the very least, I believe there is an issue of fact.

Moreover, I am unable to agree with Part D of the opinion, in which the majority holds that Northfield should be held

---

[1]While the insured's broker "used the term 'renewal' in a letter accompanying the application," stated in a letter accompanying the application that it was a renewal, his language is ambiguous. He says: "I am pleased to enclose a completed application for the above captioned account, which is a renewal to our office." However, he later says, "I am approaching 'renewal carriers.'" Both statements are made by plaintiff's agent.

While defendant does not directly deny plaintiff's assertion that the later policies were renewals, it constantly asserts that "for the period 1990-91, the ADBA requested and Northfield issued a policy which provided follow form excess coverage over the Federal primary policy which the ADBA presented to it. Northfield literally 'prepare[d] a policy in accordance with the information and instructions furnished to the [insurer] by the insured.'"

had changed the language in its own excess policy to reduce the scope of the coverage for "Advertising Injury" without notifying the insureds. Their motion for reconsideration was denied. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.   BACKGROUND

The insureds purchased primary general liability insurance policies from Federal/Chubb Insurance Co. (Federal) from 1981 through 1995. Under the terms of the Federal policies from 1981 to 1987, "Advertising Injury" was a covered peril that was defined, in pertinent part, as "injury arising out of . . . infringement of copyright." From and after 1988, however, the policy definition of "Advertising Injury" was narrowed to "infringement of copyrighted advertising materials."

Starting in 1986, the insureds submitted their Federal policies to Northfield each year as part of their application for excess coverage. Excess general liability policies were purchased from Northfield from 1986 to 1992. Northfield also provided umbrella liability coverage for the years 1988 and 1989. The insureds had sought an umbrella policy to provide coverage broader than that in the underlying Federal policy, and an excess policy to provide the same coverage but with higher limits than that provided by Federal. The insureds no longer qualified for umbrella coverage after 1990.

Northfield's 1986 and 1987 excess policies' definition of "Advertising Injury" "followed form" with the definition in the then-applicable underlying Federal policy, meaning that it incorporated that definition as part of Northfield's policy. The 1988 and 1989 policies, in contrast, expressly defined "Advertising Injury" to include "injury arising out of . . . infringement of copyright, title or slogan." This was consistent with the broader definition of the previous years. (Northfield argues that this definition was intended to apply

only to the umbrella coverage provided in those two years, about which more will be said in Part II.C. of this opinion.)

For the years 1990 and 1991, Northfield again followed form with Federal's policies, which meant that the more narrow definition was in effect. In 1992, Northfield rewrote its policy yet again, expressly reciting the narrower definition of "Advertising Injury." At no time were the insureds notified of any of these changes in the definition of "Advertising Injury" or the effect that the changes had on their coverage.

In February of 1996, the insureds were sued for copyright violations by Arista Records. Later that same year, Aerostation Corporation also brought suit against the insureds for copyright violations. Both suits involved claims reaching back to the years when the insureds were covered by Federal and Northfield. Neither suit, however, was based on infringement of copyrighted advertising materials, and thus would not be covered by the narrower definition of "Advertising Injury" in Federal's and Northfield's policies. When Federal denied coverage of the Aerostation claims, relying on the narrow definition of "Advertising Injury" that it had adopted in 1988, Northfield assumed the defense of the claims under a reservation of rights. The insureds subsequently brought suit against Federal, alleging that because they were never notified of the reduction in coverage, Michigan's "renewal rule" precluded Federal from enforcing the narrow definition. Partial summary judgment was granted in favor of the insureds, requiring Federal to defend them in the two copyright infringement lawsuits.

Aerostation's suit was settled for $700,000 in August of 1997. In March of 1998, the insureds settled the Arista lawsuit for $9,000,000 and reached a settlement with Federal that required Federal to reimburse them for one-third of this amount. Following this settlement with Federal, the insureds sought indemnification against Northfield for their excess losses. When Northfield denied coverage, the insureds commenced this suit.

---

### DISSENT

---

KENNEDY, Circuit Judge, dissenting. While I agree with the majority that had the loss here occurred while the broader definition in the 1989 policy was in effect there would have been coverage, I do so because in "Coverage B" the policy provided that "[w]ith respect to any loss covered by the terms and conditions of this policy, but not covered as warranted by the 'underlying insurance' . . . we will pay excess imposed on the insured under 'advertising injury' which occurs during the policy period." The Northfield policy's definition of "Advertising Injury" included infringement of copyright, the loss here. If Northfield failed to advise plaintiff that this provision was changed, and if Michigan's "renewal rule" applies, and if none of its other defenses are meritorious, Northfield may be liable.

However, there are a number of factors which cause me to question whether this policy is a renewal. First, Northfield was specifically solicited by the insured's broker to provide an excess policy, whereas in previous years it had written both excess and umbrella coverage. The language of the policy on which plaintiff and the panel rely has printed on it "Umbrella Liability Coverage Form." Plaintiff was not seeking umbrella coverage. Second, Northfield required the insured to file a Commercial Excess Liability Application. It did, and represented that it did not have coverage in the underlying policy for advertising injury and that the insured had no expenditure for advertising. Mr. Regnatta, an agent of Northfield, testified that he was not concerned about advertising injury in the underlying policy since the insured had no advertising expenditure. The requirement that the insured file a new application indicates a new policy, not merely a renewal. Third, the premium was negotiated between two brokers, one who represented the insured and the other who represented excess carriers. While the negotiated

### III.    CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

The insureds sought a declaration that Northfield was obligated to indemnify them and provide a defense under its policies. Northfield filed a motion for summary judgment on the ground that the insureds' conduct did not meet the underlying policy's narrow definition of "Advertising Injury." The insureds replied, however, that the narrow definition upon which Northfield relied had been incorporated into the renewal policies without notice to the insureds, and thus, under Michigan's renewal rule, the broader definition of the earlier policies should apply. Northfield maintained, however, that the definition of "Advertising Injury" that it was relying on had remained unchanged since 1988. After a hearing on the motion, the district court granted summary judgment in favor of Northfield, holding that Northfield could rely on the narrow definition first adopted by Federal in 1988 despite the fact that the insureds had never been notified of the 1988 change in the underlying policy by either Federal or Northfield.

The insureds then filed a motion for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure, arguing that Northfield had misrepresented the terms of its policies when it stated that its own definition of "Advertising Injury" had remained unchanged since 1988. Rather, the insureds argued, Northfield itself had narrowed the definition of "Advertising Injury" starting with its 1990 policy.

The district court ordered Northfield to submit a brief in response to the insureds' belated argument. In its response, Northfield acknowledged the change in definition, but argued that the definition applied only to the policies' umbrella coverage, and not to the excess coverage in question here. The district court agreed with Northfield's interpretation of the policies and denied the motion for reconsideration. Following the denial, the insureds appealed from both the grant of summary judgment and from the denial of their motion for reconsideration.

## II.   ANALYSIS

### A.  Jurisdiction and standard of review

Our jurisdiction in this case is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.  The parties do not dispute, and we agree, that Michigan law is controlling in this case.  *Erie R.R Co. v. Tompkins*, 304 U.S. 64 (1938).

We review the district court's grant of summary judgment de novo.  *Sperle v. Michigan Dept. of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002).  Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.  Argument raised on the motion for reconsideration

Northfield contends that this court cannot properly consider the legal argument raised by the insureds in their motion for reconsideration before the district court.  The insureds' initial claim was based on their argument that Northfield should be held liable for changes to the underlying policy that were not brought to their attention.  In their motion for reconsideration, the insureds argued for the first time that Northfield had defined "Advertising Injury" explicitly in its 1988 and 1989 excess liability policies, and that its decision in 1990 to incorporate the definition of the underlying Federal policy effected a curtailment of the insureds' coverage without proper notice, in violation of Michigan's renewal rule.

This issue was squarely before the district court on the motion for reconsideration and was briefed by both parties.

failure to notify the insureds of the changes in the underlying renewal policy.

This triangular relationship between the primary insurer, the excess insurer, and the insured presents the classic problem of which one of the two relatively "innocent" parties must suffer when the "wrongdoer" causes a loss.  In the present situation, we believe that Northfield, as the excess insurer, was in a much better position than the insureds to analyze unannounced changes in the underlying policy that it had agreed to follow.  As between Northfield and the insureds, therefore, Northfield should be bound to provide the greater coverage and be the one to seek indemnity back against Federal.  We are not persuaded by the dissent's assertion to the contrary, nor by its unsupported statement that this allocation of responsibility will increase the cost of excess insurance with little benefit to the insureds.

Northfield also maintains that the Michigan renewal rule is based on estoppel principles, while the insureds counter that it is a matter of contract reformation.  Despite Northfield's assertions to the contrary, we find no authority to support its contention that the renewal rule requires detrimental reliance by the insureds, and find numerous cases that have applied the rule with no discussion of estoppel.  *Koski*, 539 N.W. 2d at 563 (applying the renewal rule with no discussion of estoppel or reliance); 2 *Couch on Insurance*, § 29:42 (2002).

Finally, Northfield is not released from its obligation imposed by the renewal rule on the ground that the coverage in question was not important to the insureds.  This type of extra-contractual argument, if successful, would require those purchasing insurance to affirmatively validate the importance of each and every coverage purchased.  We find no authority supporting such an obligation.  Furthermore, we suspect that any such obligation would turn the world of insurance upside down, since one has to be either super-diligent or a masochist to read an insurance policy with a fine-toothed comb.

## D. Northfield's liability for the insureds not being notified of changes to the underlying policy

Although the above analysis is sufficient to require reversal of the district court's grant of summary judgment in favor of Northfield, we note the insureds' alternative argument that Northfield failed in its alleged obligation to notify the insureds of the reduced coverage under its policy when the underlying Federal policy was changed in 1988 and Northfield continued to "follow form." We find no support for the proposition that an excess carrier such as Northfield is obligated to itself notify the insureds of a detrimental change in the underlying policy, nor have the insureds cited any such authority. On the other hand, there is no question that, under Michigan law, a primary carrier has an affirmative obligation to notify its insured of any change in coverage in its renewal policy, and "[w]here a renewal policy is issued without calling the insured's attention to a reduction in coverage, the insurer is bound to the greater coverage in the earlier policy." *Koski v. Allstate Ins. Co.,* 539 N.W.2d 561, 563 (Mich. Ct. App. 1995). This is known as the "renewal rule."

The real question, then, is whether an excess carrier such as Northfield is bound as a matter of law by the underlying carrier's failure to comply with the renewal rule. We believe that the answer is "yes," because the "follow form" linkage between an excess insurer and the primary insurer should logically apply to procedural as well as substantive obligations to their common insured. In effect, an excess insurer who lives by the sword must die by the sword. We note, however that "although there is no contractual relationship between a primary and a[n] . . . excess insurer, it is commonly understood that the primary insurer owes the 'true' excess insurer the same standard of care it owes to the insured." *Frankenmuth Mut. Ins. Co., Inc. v. Continental Ins. Co.,* 537 N.W.2d 879, 881 n.6 (Mich. 1995). Thus, as a general proposition, an excess insurer might have an indemnity action against the primary insurer for the latter's

In addition, the appeal currently before us is from both the grant of summary judgment and the denial of the insureds' motion for reconsideration. We thus find no basis to hold that this argument is untimely. The insureds' contention will therefore be considered on its merits.

## C. "Advertising Injury" definition is applicable to Northfield's excess coverage

The key question on the merits is whether the explicit definition of "Advertising Injury" in Northfield's 1988 and 1989 policies applied to the excess liability coverage. Northfield maintains in its brief that it did not, instead contending that "the definition of 'Advertising Injury' defines the scope of *only* the *umbrella* coverage (Coverage B), not the *excess* coverage (Coverage A)." (Emphasis in original.) We find this position, however, impossible to reconcile with the express language of the policies in question.

As discussed above, Northfield's excess insurance policies prior to 1988 had followed form over Federal's definition of "Advertising Injury," while both the 1988 and 1989 Northfield insurance policies contained new language that explicitly defined "Advertising Injury." The 1988 and 1989 Northfield policies contain the following relevant provisions: (1) that "Coverage A" (the excess coverage) "applies to 'Bodily Injury', 'Personal Injury', 'Property Damage', or 'Advertising Injury' . . . ."; (2) that these "words and phrases that appear in quotation marks have special meaning. Please refer to the DEFINITIONS section of this policy"; (3) that "Advertising Injury" included "injury arising out of [i]nfringement of copyright, title or slogan; and (4) that "the terms and conditions of the scheduled underlying policies are incorporated as part of this policy . . . except for . . . any . . . provision that is not consistent with a provision of this policy." This language is not found in Northfield's policies from 1990 forward.

Thus, the plain language of the 1988 and 1989 policies makes clear that Northfield's express definition of "Advertising Injury" is the appropriate definition for the excess coverage, despite the fact that it differed from the narrower definition in the underlying Federal policy at that time. We therefore conclude that Northfield's policies in 1988 and 1989 gave coverage for liability arising out of any copyright violation. Because Northfield never gave the insureds notice that it had narrowed the scope of its "Advertising Injury" coverage from and after 1990, Michigan's renewal rule obligates Northfield to provide the broader coverage for the copyright claims filed against the insureds in 1996. See Part II.D. below for a discussion of the "renewal rule."

Northfield, however, argues that it is illogical for an excess liability insurance policy to provide coverage that goes beyond the parameters of the underlying policy. It points out that the express definition of "Advertising Injury" was removed at the same time that the insureds ceased their umbrella coverage, a fact that Northfield contends is supportive of its argument that the definition was intended to apply only to the umbrella coverage. But whether logical or not, and even if inconsistent with Northfield's intent, the express language in Northfield's insurance policies must control. Under Michigan law, "the trial court shall give the language contained within the policy its ordinary and plain meaning so that technical and strained constructions are avoided." *Royce v. Citizens Ins. Co.,* 557 N.W.2d 144, 147 (Mich. Ct. App.1996). In addition, "[i]f the trial court determines that the policy is ambiguous, the policy will be construed against the insurer and in favor of coverage." *Id.*

The pertinent policy language clearly places the definition of "Advertising Injury" under Coverage A, the excess coverage portion of the policy, or, at the very least, the policy language is ambiguous and should be construed in favor of the insureds. We find no reading that justifies Northfield's position that the policies unambiguously provide that the

definition of "Advertising Injury" applies only to Coverage B, the umbrella coverage. The district court's conclusion to the contrary cannot be sustained.

Rather than directly challenge the above analysis, the dissent questions whether the 1990 Northfield policy was in fact a renewal. Although the five factors that the dissent discusses may well be ones that should be considered under circumstances where the issue is disputed by the parties, that is not the situation here. We cannot ignore the fact that Northfield has treated the policy in question as a renewal and has never contended otherwise. Northfield had every reason to argue that the policy was not a renewal, yet it failed to do so. In addition, the insureds specifically characterized their 1990 application as a "renewal" and made clear that they were "only approaching renewal carriers and would like to keep the structure the same." Northfield issued the policy in question pursuant to this application. According to a leading treatise, "the parties may effectively designate that the renewal policy shall be regarded as a continuation of the policy or that it shall not be so regarded." 2 *Couch on Insurance* §29:33 (2002). Assuming that the determination of whether a subsequent policy is a renewal or a new policy requires the weighing of numerous factors, no factor carries more weight than the intention and understanding of the contracting parties.

The dissent fails to cite any case employing the factors that it identifies where both parties have indicated their understanding that the policy was a renewal. In *Koski v. Allstate Insurance Co.*, 539 N.W. 2d 561 (Mich. Ct. App. 1995), *rev'd on other grounds*, 572 N.W. 2d 636 (1998), for example, the renewal policy changed the insured's coverage in several ways, a factor that the dissent points to as supporting the view that Northfield's 1990 policy was not a renewal. Yet the court in *Koski* held that the policy before it was a renewal for the purpose of applying Michigan's renewal rule. *Id*, at 564. In sum, we find no convincing reason why we should treat Northfield's policy any differently than how it was treated by the parties themselves.