**JPMORGAN CHASE & CO. f/k/a Bank One Corporation, Plaintiff,**

v.

**Sandra E. PIERCE, Defendant.**

No. 05–CV–74455.

United States District Court, E.D. Michigan, Southern Division.

July 5, 2007.

Daniel D. Quick, Dickinson Wright, Bloomfield Hills, MI, Nicole M. Wotlinski, Dickinson Wright, Detroit, MI, for Plaintiff.

Lori L. Rogala, Thomas G. Kienbaum, Keinbaum, Opperwall, Birmingham, MI, for Defendant.

*ORDER GRANTING JPMORGAN'S MOTION FOR SUMMARY JUDGMENT (# 42) AND DENYING PIERCE'S MOTION FOR SUMMARY JUDGMENT (# 39)*

GEORGE CARAM STEEH, District Judge.

Plaintiff JPMorgan Chase & Co. and defendant Sandra Pierce each move for summary judgment of JPMorgan's breach of contract claim. A hearing on the motions was held on May 30, 2007. For the reasons set forth below, JPMorgan's motion for summary judgment will be GRANTED, Pierce's motion for summary judgment will be DENIED, and judgment shall enter in favor of JPMorgan in the amount of $376,348.59.

## I. Background

JPMorgan filed a complaint on November 22, 2005 stating Sandra Pierce supervised 350 Bank branches as a Senior Vice President and Midwest Regional Manager for JPMorgan and its predecessor Bank One Corporation. JPMorgan and Bank One merged on July 1, 2004. During her tenure, Pierce received stock awards from 1999 through 2003 pursuant to corresponding "Stock Award Agreements," a February 16, 1999 and February 20, 2001 "Bank One Corporation Stock Performance Plan" (respectively "1999 Plan" and "2001 Plan"), and Award Summaries. Each of the Stock Award Agreements prohibited Pierce from becoming employed by a JPMorgan competitor and "perform[ing] the same or substantially similar functions to those which he [or she] performed while employed by [JPMorgan]" and "in a manner which is or may reasonably be expected to be prejudicial to or in conflict with the interests of [JPMorgan]." The Stock Award Agreements also provided for liquidated damages in the event of a breach: (1) immediate cancellation of all outstanding restricted shares; (2) reimbursement

in an amount equal to the value of these cancelled shares; (3) immediate cancellation of all outstanding stock options; and (4) reimbursement in an amount equal to any gain received from the exercise of stock options beginning one year prior to and ending one year after termination of employment.

Pierce tendered her resignation to her direct supervisor Executive Vice President Saundra Schrock, and the two discussed Pierce's new job responsibilities at Charter One Bank, N.A. Pierce terminated her employment with JPMorgan on December 10, 2004, and went to work for Charter One the following year. Schrock subsequently contacted Anne Leyden of the Human Resources Department, who consulted with JPMorgan's Legal Department and drafted a January 27, 2005 memo regarding the perceived breach of Pierce's non-compete covenants. Schrock approved Leyden's memo recommending a "claw-back" of the stock awards, then forwarded the memo to Human Resources Director John Farrell. Farrell approved the memo and authorized the "claw-back" of Pierce's stock gains. On February 14, 2005, JPMorgan Senior Counsel Eloise Gries Cookson sent Pierce a letter notifying Pierce that she was in breach of the non-compete covenants and demanding $376,348.59 in liquidated damages as calculated in an attached schedule. JPMorgan filed this lawsuit for breach of contract nine months later on November 22, 2005.

## II. Summary Judgement

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward,*

241 F.3d 530, 532 (6th Cir.2001). The standard for determining whether summary judgment is appropriate is whether the evidence presents a sufficient disagreement to require submission to the trier-of-fact or whether it is so one-sided that one party must prevail as a matter of law. *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Redding,* 241 F.3d at 532 (6th Cir.2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see also McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the nonmovant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Anderson,* 477 U.S. at 248, 252, 106 S.Ct. 2505. Rather, there must be evidence on which the fact-finder could reasonably find for the non-movant. *McLean,* 224 F.3d at 800 (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

## III. Delaware Law Controls and Requires Contract to be Construed as a Matter of Law

■ The court initially raised the issue of whether the Employee Retirement

Income Security Act of 1974 (ERISA), 29 U.S.C. § 1101 et *seq.*, applies to JPMorgan's breach of contract claim. An employee benefit plan falls under ERISA only if it establishes benefits requiring "an ongoing program to meet the employer's obligations." *Wayne D.O. v. Detroit Medical Center Non–Qualified Deferred Compensation Plan,* No. 06–CV–15081, 2007 WL 624124 at *6 (E.D.Mich. Feb.23, 2007) (unpublished) (quoting *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)). "To determine whether a severance agreement plan falls under ERISA, courts look to (1) whether the employer has discretion over the distribution of benefits and (2) whether there are ongoing demands on an employer's assets." *Wayne D.O.,* 2007 WL 624124 at *6 (citing *Kolkowski v. Goodrich Corp.,* 448 F.3d 843, 848 (6th Cir.2006)). If, as here, the only discretionary decision to be made is whether the employee violated a covenant not to compete, and the decision involves a lump-sum payment as opposed to an ongoing payment obligation, the severance agreement is not governed by ERISA. *Wayne D.O.,* 2007 WL 624124 at *8. *See also Oatway v. American Int'l Group, Inc.,* 325 F.3d 184 (3rd Cir.2003) (holding that employee stock option plan was not an ERISA plan). Accordingly, JPMorgan's breach of contract claim is governed by state law.

Sitting in diversity, the court must apply Michigan's conflict of law rules. *See Banek Inc. v. Yogurt Ventures U.S.A., Inc.,* 6 F.3d 357, 361 (6th Cir.1993). The parties agree Delaware law is controlling, an agreement consistent with the Delaware choice of law provisions set forth in the Stock Award Agreements. The court will apply Delaware law. *See Wonderland Shopping Center Venture Ltd. Partnership v. CDC Mortgage Capital, Inc.,* 274 F.3d 1085, 1092 (6th Cir.2001); *Equitable Life Assurance Society of the United States v.*

*Poe,* 143 F.3d 1013, 1016 (6th Cir.1998); *Chrysler Corporation v. Skyline Indus. Serv., Inc.,* 448 Mich. 113, 120, 120 n. 14, 125, 528 N.W.2d 698 (1995).

Contract construction under Delaware law is purely a question of law. *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992). The court must examine the entire agreement and determine whether the contractual intent may be discerned from the express words of the contract, or whether the contractual terms are ambiguous. *Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 13 (Del.Ch. 2003). In resolving questions of contractual ambiguity, "[t]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone–Poulenc,* 616 A.2d at 1196. A contractual ambiguity arises if the contract provision in question is reasonably susceptible to different interpretations or meanings. *Id.*

## IV. Standard of Record Review

JPMorgan argues that the court must apply a deferential "arbitrary and capricious" standard of review to its decision to recoup Pierce's stock gains. Where a contract vests a corporate administrative committee with the authority to make "binding, final and conclusive" decisions regarding an employee's eligibility under a corporate compensation plan, a court should accept the committee's decision as "conclusive in the absence of fraud, bad faith and the like." *Schwartz v. Century Circuit, Inc.,* 163 A.2d 793, 796 (Del. Ch.1960). Relying in part on *Schwartz,* one Delaware Superior Court has held:

> [W]hen a stock option committee is vested with final, binding and conclusive authority to determine a participant's

right to receive or retain benefits, that decision made in accordance with the provisions of the agreement will not be second guessed by the Court absent a showing of fraud or bad faith.

*W.R. Berkley Corp. v. Hall,* No. Civ.A. 03C–12–146WCC, 2005 WL 406348, *4, *4 fn. 13 (Del.Super.Feb.16, 2005) (unpublished) (citing *inter alia Schwartz, supra, Weir v. Anaconda Co.,* 773 F.2d 1073 (10th Cir.1985) (applying arbitrary, fraudulent, and bad faith standard of review to corporate committee's denial of stock option benefits consistent with plan language and Kansas law), and *McIntyre v. Philadelphia Suburban Corp.,* 90 F.Supp.2d 596 (E.D.Pa.2000) (same under Pennsylvania law)). *Hall* involved a corporate committee's decision that an employee had breached a non-compete clause in a stock option plan, and was thus liable under the terms of the plan for profits he had gained through the exercise of certain stock options. *Id.* at *1. The stock option agreement in *Hall* granted the committee "absolute discretion" to make "final, binding and conclusive" determinations, while the plan itself provided that "all decisions" were "final and binding." *Id.* at *3. The committee's "claw-back" decision was upheld in the absence of evidence that the committee relied upon false or incorrect evidence, or acted in bad faith. *Id.* at *4–*5.

Pierce maintains that JPMorgan's decision is subject to *de novo* review. In reviewing a corporate board's decision to cancel certain executive stock options following a corporate merger, one federal district court applying Delaware law drew an analogy to the review of decisions under ERISA with respect to "top hat plans"[1] where the plan authorized the administra-

tor to interpret the plan. *Hilton Hotels Corporation v. Dunnet,* 275 F.Supp.2d 954, 967 (W.D.Tenn.2002). Recognizing that the plans at issue authorized a board committee to interpret the plans and agreements, the district court held that the board's decision was subject to judicial review for an exercise of good faith and reasonable discretion "subject to the idea that the Court must review the Board's decision more closely where there is evidence of a conflict of interest or bias." *Hilton Hotels,* 275 F.Supp.2d at 961, 967–68. The court found "abundant evidence" that the board had arbitrarily interpreted the plan as authorizing a cancellation of executive stock options prior to a merger with Hilton Hotels, including an "eleventh hour" change of interpretation after the issue became a "deal-breaker" for the acquiring Hilton Hotels corporation. *Hilton Hotels,* 275 F.Supp.2d at 961. The district court conducted its own interpretation of the plan language and denied summary judgment on concluding that the plan language did not unambiguously support the corporation's position that the plan authorized the cancellation of the executive stock options. *Id.* at 961, 963.

Common among the cited authority is the legal principal that, if a stock option compensation plan authorizes the corporate decision-maker to interpret the plan and issue final and binding plan decisions, a court will uphold a decision if it is consistent with the plan language and not otherwise the product of fraud, bad faith, or an abuse of reasonable discretion. *Schwartz,* 163 A.2d at 796; *Hall,* 2005 WL 406348, at *4; *Hilton Hotels,* 275 F.Supp.2d at 961, 967–68. The *Hilton Hotels* court "more closely" reviewed a corporate board's in-

---

1. "A top hat plan differs from the typical ERISA plan because a top hat plan applies only to highly paid executives who are in a strong bargaining position relative to their

employers and because the administrator is not considered the fiduciary of the plan." *Hilton Hotels,* 275 F.Supp.2d at 967.

terpretation of a stock option plan *for an abuse of discretion* after independent evidence was proffered of a conflict of interest—that the board had suddenly changed its interpretation of the plan, without further legal research, simply to facilitate a corporate merger. *Id.* at 961. This approach is analogous to the review of ERISA decisions: "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor [ ] in determining whether there is an abuse of discretion.'" *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979 (6th Cir.1991) (quoting *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)).

Paragraph 4(b) of the 1999 Plan provides:

> (b) The Committee shall have authority to interpret and construe the Provisions of the Plan and the Award Summaries and make determinations pursuant to any Plan provision or Award Summary which shall be final and binding on all persons.....

Paragraph 4(b) of the 2001 Plan varies only slightly:

> (b) The Committee shall have authority to interpret and construe the Provisions of the Plan and the Award Summaries and make determinations pursuant to any Plan provision or Award Summary. Any such interpretation or determination shall be final and binding on all parties.....

The Stock Award Agreements provide that: "Grants are subject to the terms of the Plan. To the extent the terms of this summary conflict with the Plan, the Plan shall govern."

The 1999 Plan and 2001 Plan unambiguously express the intent that the Committee is authorized to interpret the Plans and issue final and binding plan decisions.

*Rhone-Poulenc*, 616 A.2d at 1195; *Comrie*, 837 A.2d at 13. Pierce's argument that the absence of authority to issue "final and binding" determinations in one or more of the Stock Award Agreements divests the Committee of such authority is not well taken considering that the 1999 Plan and 2001 Plan express control over the Stock Award Agreements. *Id.* Pierce also argues that, notwithstanding the grant of discretionary authority to the Committee, the court must apply a *de novo* standard of review because decision-maker Human Resources (HR) Director Farrell was never delegated decision-making authority by the Committee or JPMorgan's Chief Executive Officer (CEO). Pierce relies on *Crider v. Highmark Life Ins. Co.*, 458 F.Supp.2d 487 (W.D.Mich.2006) and *Mauldin v. Worldcom, Inc.*, 263 F.3d 1205 (10th Cir. 2001) to support her position.

The district court in *Crider* applied a *de novo* standard of review in an ERISA action after determining that a disability benefits plan did not contain provisions authorizing the plan issuer to delegate its decision-making authority to a third-party claims administrator, thus failing to meet ERISA's requirement of an "express" delegation of authority. *Crider*, 458 F.Supp.2d at 502 (citing 29 U.S.C. § 1105(c)(1)). In contrast, the 1999 Plan and 2001 Plan each expressly provide at paragraph 4(c):

> The Committee may designate persons other than its members to carry out its responsibilities under such conditions or limitations as it may set, other than its authority with regard to Awards granted to Employees who are officers or directors of the Corporation for purposes of Section 16 of the Exchange Act.

*Crider* is thus distinguishable beyond the additional circumstance that the 1999 Plan and 2001 Plan are not ERISA plans subject to the requirements of 29 U.S.C.

§ 1105(c)(1). In opposing JPMorgan's motion, Pierce has failed to proffer evidence that paragraph 4(c) is inapplicable because she was an officer or director of JPMorgan for purposes of Section 16 of the Securities and Exchange Act of 1934. *McLean,* 224 F.3d at 800; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. *See C.R.A. Realty Corp. v. Crotty,* 878 F.2d 562, (2d Cir.1989) (holding that an employee's title alone is insufficient to support a finding that an employee is an officer or director for purposes of § 16(b)); § 16(a), 15 U.S.C. § 78p(a) (requiring certain officers and directors to file SEC statements when acquiring or changing ownership in corporate stock). Pierce has not, for example, produced SEC statements she was required to file under § 16.

Applying Texas law, the Tenth Circuit Court of Appeals in *Mauldin* applied a *de novo* standard of review after finding that a compensation committee's delegation of decisional authority to an HR vice president, although authorized by the stock option plan, was ineffective because the authority was delegated after the vice president made his decision to deny benefits. *Mauldin,* 263 F.3d at 1213. "[A] principal must have delegated authority to an agent prior to the agent's act, or else the agent will not have authority at the time of the act in question." *Id.*

As previously stated, the 1999 Plan and 2001 Plan, at their respective paragraphs 4(c), expressly provide for a delegation of authority from the Committee "to persons other than its members to carry out its responsibilities." Again, to the extent the 1999 Plan or 2001 Plan conflict with any of the Stock Award Agreements, "the Plan[s] shall govern." The April 30, 1999 and June 22, 2000 Stock Award Agreements read: "The Plan is administered by the Organization, Compensation and Nominating Committee of the Board [*of Directors* ].[2]" (emphasis and brackets added). The August 14, 2001 and July 5, 2002 Stock Award Agreements provide:

> The Plan is administered by the Committee, which has delegated its authority to the Chief Executive Officer of the Corporation to administer this award, including, without limitation, the power to (i) interpret the Plan and the terms of this [*Award Summary* ]; (ii) determine the reason for termination [of employment] and application of the restrictive covenants; (iii) decide all claims arising with respect to this award. Any determination by the Chief Executive Officer will be [*final and* ] binding on all parties.

(emphasis and brackets added) [3]. The August 15, 2003 Stock Award Agreement reads:

> The Plan is administered by the Organization and Compensation Committee of the Board of Directors of Bank One, which has delegated its authority to the Chief Executive Officer of the Corporation or his designate to administer this Award, including, without limitation, the power to (i) interpret the Plan and the terms of this Award Summary; (ii) determine the reason for termination of employment and application of the restrictive covenants; (iii) decide all claims arising with respect to this award. Any

---

**2.** The April 30, 1999 Stock Award Agreement reads "... the Board," while the June 22, 2000 Stock Award Agreement reads "... the Board of Directors."

**3.** The August 14, 2001 Stock Award Agreement reads "interpret the Plan and the terms of this award" and "Any determination by the Chief Executive Officer will be binding on all parties," while the July 5, 2002 Stock Award Agreement reads "interpret the Plan and the terms of this Award Summary" and "Any determination by the Chief Executive Officer will be final and binding on all parties."

determination by the Chief Executive Officer will be final and binding on all parties.

HR Director Farrell made his "claw-back" decision after receiving Leyden's January 27, 2005 memo, and before Cookson's February 14, 2005 letter notifying Pierce of the decision. On September 16, 2002, then Bank One Board Chairman and CEO Jamie Dimon executed a "DELEGATION OF AUTHORITY WITH RESPECT TO STOCK AWARDS":

> I hereby delegate to the Head of Human Resources of Bank One ("Bank One") the authority to determine whether an employee or former employee of Bank One or any of its subsidiaries or affiliates (other than a member of the Bank One Planning Group) has violated any restrictive covenant provisions under any stock award agreement issued pursuant to the Bank One Performance Plan ("the Plan"), including without limitation, provisions restricting use or disclosure of confidential information, solicitation of employees or customers or competitive employment. This delegation includes the authority to interpret relevant provisions of the Plan and stock award agreements, to make factual assessments and to take any other actions or make any other decisions deemed appropriate by the Head of Human Resources to make determinations authorized hereby.

Unlike the circumstances in *Mauldin,* the decision-maker here, HR Director Farrell, was expressly delegated authority in 2002 to make determinations "under any stock award agreement" well before he made his decision with respect to Pierce in 2005. *Compare Mauldin,* 263 F.3d at 1213. The August 14, 2001 and July 5, 2002 Stock Award Agreements, predating the September 16, 2002 delegation of authority from Board Chairman and CEO

Dimon to HR Director Farrell, constitutes express evidence that "the Committee ... has delegated its authority to the Chief Executive Officer of the Corporation...." The August 15, 2003 Stock Award Agreement is express evidence confirming that, prior to the 2005 decision involving Pierce, the "Plan is administered by the ... Committee ... which has delegated its authority to the Chief Executive Officer of the Corporation or his designate...." Pierce's argument that she is entitled to *de novo* review pursuant to *Mauldin* in the absence of evidence of a delegation of decisional authority from CEO Dimon to HR Director Farrell is not well taken. *Mauldin,* decided under Texas law, is distinguishable on its facts.

Upon examination of the parties' entire agreement pursuant to Delaware law, the court finds no contractual ambiguity and no reasonable factual dispute that HR Director Farrell was authorized as JPMorgan's decision-maker to interpret the 1999 Plan and 2001 Plan and issue a final and binding decision whether to "claw-back" Pierce's stock option gains. *Comrie,* 837 A.2d at 13; *Rhone–Poulenc,* 616 A.2d at 1196. Accordingly, the court will uphold Farrell's decision if it is consistent with the 1999 Plan and 2001 Plan language and not otherwise the product of fraud, bad faith, or an abuse of reasonable discretion. *Schwartz,* 163 A.2d at 796; *Hall,* 2005 WL 406348, at *4; *Hilton Hotels,* 275 F.Supp.2d at 961, 967–68. De novo review would have required the court to take a "fresh look" at the evidence and decide if the court agrees with the decision-maker. *See Crider v. Highmark Life Ins. Co.,* 458 F.Supp.2d 487, 503 (W.D.Mich.2006) (noting ERISA *de novo* standard of review and citing *Perry v. Simplicity Eng.,* 900 F.2d 963, 966 (6th Cir.1990) and *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 616 (6th Cir.1998)).

Pierce does not allege or argue that Farrell's decision is the product of fraud. Rather, Pierce asserts the decision is "arbitrary and capricious" and thus the result of an abuse of discretion.

"Arbitrary and capricious" is usually ascribed to action which is unreasonable or irrational, or to that which is unconsidered or which is wilful and not the result of a winnowing or sifting process. It means action taken without consideration of and in disregard of the facts and circumstances of the case. Action is also said to be arbitrary and capricious if it is whimsical or fickle, or not done according to reason; that is, it depends upon the will alone.

*Maher v. N.E.C.A.—Local Union No. 313, I.B.E.W. Pension Trust Fund,* Civ. A. No. 5026, 1977 WL 9559, * 4 (Del.Ch. Dec.21, 1977) (unpublished) (citing *Willdel Realty, Inc. v. New Castle County,* 270 A.2d 174, 178 (Del.Ch.1970)).

## V. Record Review

■ JPMorgan contends HR Director Farrell properly concluded that Pierce breached the non-compete clauses by becoming employed by JPMorgan competitor Charter One and performing "the same or substantially similar functions" she had performed as JPMorgan's Senior Vice President. Pierce responds that she performed only "retail" banking functions for JPMorgan, and performs only "commercial" banking functions at Charter One for customers with revenues of greater than $10.0 million. Pierce maintains that Farrell's decision that she performed the "same or substantially similar functions" at Charter One is biased and not the product of a deliberate principled reasoning process [4].

Saundra Schrock, Pierce's direct supervisor at JPMorgan, testified regarding her conversation when Pierce tendered her resignation:

Q. What was it that Miss Pierce told you that made you go to HR and start this process?

A. [by Schrock] First of all, when she notified me that she was resigning, that she was accepting the position of president of Charter One in Michigan.

And the conversation, the best of my knowledge, went along something like this: Saundra, I've decided to accept the position, it will allow me to be president of all the functions and all the responsibility for overall in Michigan, which is a broader based job than I have today. Something along those lines. And that it will allow me not to have to travel, which a small portion of Sandy's job was to travel, and be home with my family.

That would trigger she is going to a major competitor. And that it would, in my mind, be a position that my first thought would be might trigger something in our stock performance agreement. And I called HR not only to tell her that a very senior person had resigned. I called my boss as well.

And frankly, the very first thought was not of the stock agreement, but the fact that she was leaving. That was a very—It was, you know, not obviously something we had anticipated to happen.

Q. You said that she told you she was going to be president of Charter One in Michigan over all functions?

A. Right.

Q. What was your understanding of what she meant by all functions?

---

4. Pierce relies on *Rochow v. Life Ins. Co. of North America,* 482 F.3d 860, 865 (6th Cir. 2007) (applying ERISA standard of review).

A. We didn't have a detailed conversation. But to the best of my ability of understanding exactly what she said on the initial conversation was she was going to be president of the overall bank which, frankly, we did not discuss in detail, but it was—the assumption would be that it would be all aspects of the bank.

Schrock March 7, 2007 Tr., at 28–29. Pierce does not dispute the substance of this conversation with Schrock, testifying:

Q So now, here we are at November 26, 2004.

What was your personal understanding at that point as to whether or not the position you were about to assume at Charter triggered those clawback obligations?

[Pierce's Counsel]: Trigger, of course, was action by [JPMorgan]. They would trigger it because—they would need to make a decision, but I gather what you're saying is whatever thinking she might have had about exposure if they triggered as a procedure.

[JPMorgan's Counsel]: Fair.

A. [by Pierce] I definitely thought I had exposure, because I was going to be—I was being hired as the president and CEO in charge of all lines of business in the market.

Pierce November 30, 2006 Tr., at 108–09.

Anne Leyden, then employed in JPMorgan's HR Department, attests that she learned on November 30, 2004 that Pierce was resigning "to accept employment at Charter One Bank . . . as its President and CEO for its Michigan operations." Leyden March 29, 2007 Declaration, ¶ 2, at 1. Leyden attests that she and her team worked with JPMorgan's Legal Department to draft a memorandum concerning Pierce's new employment and whether Pierce was in violation of the non-compete covenants. *Id*, ¶¶ 3–4, at 1. Leyden attests that the memorandum, which she forwarded to HR Director Farrell, included a comparison of Pierce's responsibilities at JPMorgan and Charter One as related to Schrock by Pierce, and as set forth in a Charter One November 30, 2004 Press Release. *Id*, ¶ 5–6, at 1. The Press Release reads in part:

### Charter One Bank appoints Sandra E. Pierce President and CEO of Charter One Bank in Michigan

**DETROIT, MI**—Charter One Bank, N.A., today announced that Sandra E. Pierce, a regional executive at Bank One with more than 25 years of experience, has been appointed President and CEO of its banking operations in Michigan. As Michigan President for Charter One Bank, Pierce will oversee 140 branches and more than 1,100 employees throughout the state, including branch staff, business bankers and commercial lenders.

\*　　\*　　\*

. . . . [Pierce] will join the company on January 3, 2005 and report to Tom Hollister, who is President and CEO of Charter One Bank, N.A., and a Citizens Financial Group Vice Chairman in charge of Midwest Banking.

Leyden's January 27, 2005 memorandum, signed by Schrock and forwarded to Farrell, provides in relevant part:

On December 10, 2004 Sandra Pierce resigned from her position as Midwest Regional Manager of Consumer Banking for JPMorgan Chase & Co. (JPMC) to accept a position as Chief Executive Officer and President of Michigan for Charter One Bank. Sandra managed approximately 350 Branches in her position with JPMC, formerly Bank One.

Sandra's responsibilities as CEO and President for Charter One Bank will

include management responsibility for all its retail banking branches. Thus, she will be performing duties that are substantially similar to those that she performed at JPMC. Charter One directly competes with JPMC in retail banking and other businesses in Michigan.

Leyden attests that she discussed the circumstances of Pierce's resignation and the memorandum with Farrell, who then approved the "claw-back" recommendation. Leyden March 29, 2007 Declaration, ¶¶ 7–8, at 2.

Farrell testified at his February 27, 2007 deposition that he did not recall the July 27, 2005 memorandum or Pierce, but after reading the memorandum, Farrell testified that he would have approved the "claw-back." Farrell February 27, 2007 Tr., at 41, 57–59.

A. [by Farrell] First, I would rely on Sandra [Pierce]. She is the executive vice president and runs the whole US. So this is a very senior person. Based upon what I read here, I would clearly have supported it and I agree with her.

*Id*, at 41. A July 25, 2005 memorandum from Farrell to Schrock, initialed by Farrell, states: "This is to confirm the determination I made in January 2005 adopting the recommendation of Sandra Schrock dated January 27, 2005 . . . ." Farrell testified that the initials on the July 25, 2005 memorandum were his initials. Farrell February 27, 2007 Tr., at 56.

Pierce herself testified:

Q. So if at any time before May 12, 2005 that JPMorgan Chase determined that based on the press release and based upon what it knew that you would be directly responsible for retail in Michigan, that hence you had violated the stock agreements, you wouldn't fault JPMorgan for coming to that decision based on the information it had?

A. [by Pierce] Well that's—I would not fault JPMorgan for coming to that conclusion. That's the conclusion I came to when I quit.

Pierce November 30, 2006 Tr., at 178.

Construing the record evidence in a light most favorable to Pierce, it is beyond reasonable dispute that Farrell's "claw-back" decision on behalf of JPMorgan was not unreasonable or irrational, unconsidered, taken without consideration of relevant facts and circumstances, whimsical or fickle, done without reason, or biased, but was instead the product of a deliberate reasoning process. *Amway Distributors,* 323 F.3d at 390. Farrell's inability to recall Pierce or his own involvement with the 2005 decision does not displace the uncontested evidence that Farrell was the decision-maker. Farrell's lack of recall is also understandable and consistent with his testimony that he was involved in "tons" of such decisions involving a "staggering number" of dollars. Farrell February 27, 2007 Tr., at 34–45. Farrell's testimony that a "claw-back" would be "automatic" with respect to high-level executives because "[e]verybody knows" the new employer will reimburse any loss does not alter that, in Pierce's case, Farrell relied on the information gathered by Leyden and Schrock as set forth in the January 27, 2005 memorandum. It was not arbitrary or capricious for Farrell to assume that Pierce, as the CEO and President of Michigan for Charter One Bank, would be a member of a Charter One management committee. Farrell's testimony that the decision was "not complicated" suggests only that the decision was not difficult for him in light of the facts and circumstances. Pierce's argument that Schrock recommended a "claw-back" solely because Pierce was going to a competitor is belied by the January 27, 2005 memorandum. It is also uncontested that Farrell, not

Schrock, was the final decision-maker. Pierce's argument that the January 27, 2005 memorandum evidences arbitrary and capricious conduct because it is nearly identical to a September 8, 2003 memorandum authored by Pierce recommending a "claw-back" with respect to one Michael Newbold is unavailing given the similarity of Newbold's new "responsibilities as Chief Operating Officer for Union Federal [which] will include management responsibilities for all its retail branches." Defendant's March 30, 2007 Exhibit 13.

The gravamen of Pierce's argument is that, once hired by Charter One, she ultimately did not receive responsibility for "retail" banking functions, and therefore Schrock's January 27, 2005 memo erroneously states that Pierce's Charter One position includes "management responsibility for all of its retail banking branches." Pierce asserts that JPMorgan erred because Farrell did not consider Pierce's actual job functions at Charter One. The court disagrees.

Pierce concedes in her brief opposing JPMorgan's motion for summary judgment that "the analysis of Farrell's actions must focus on what he did and knew on January 27, 2005, the time he supposedly made his decision." April 23, 2007 Response Brief, at 19. Pierce admitted that, at the time the "claw-back" decision was made, she herself concluded that she was in breach of the non-compete covenants because she would be responsible for "retail" banking functions at Charter One. Pierce November 30, 2006 Tr., at 178. Pierce candidly testified that she was "hired as president and CEO running all lines of businesses for Charter One in Michigan," then spent her first ten months at Charter One arguing for retail responsibility. *Id.* at 111–112. Pierce also testified:

Q. Do you have any reason to believe that as of May 12, 2005 that JPMorgan Chase had any reason to believe that you, in fact, were not in charge of retail in the State of Michigan or directly responsible for it?

A. I don't—I can't imagine how they would have known what was going on internally.

*Id.* The May 12, 2005 date is in obvious reference to a May 12, 2005 letter from Pierce's Counsel to JPMorgan, explaining why Pierce believed she was not subject to "claw-back":

> . . . . At [JPMorgan], Ms. Pierce was the regional executive of Midwest Retail Operations for Michigan and Indiana. She focused solely on the retail aspect of the business and directly supervised the numerous [JPMorgan] branches in those states, interacting with the branch management on a regular basis. She had no management responsibility for any other business area including but not limited to commercial lending, private banking and investment and business banking. In contrast, in her executive position at Charter One Michigan, *Ms. Pierce is in charge of all operations for such bank within the state of Michigan, not simply retail.*

Plaintiff's March 30, 2007 Exhibit 14 (emphasis added). Even as late as May 12, 2005, four months after Pierce left JPMorgan, and nearly four months after the "claw-back" decision had been made, the information available to JPMorgan still supported a conclusion that Pierce was responsible for "retail" functions at Charter One, the "same or substantially similar functions" she had performed at JPMorgan.

Pierce has failed to advance language in the 1999 Plan, 2001 Plan, or any of the Stock Award Agreements, that would support a finding that Farrell, on behalf of

JPMorgan, was contractually required to postpone its "claw-back" decision. *Comrie*, 837 A.2d at 13. A reasonable person in Pierce's position could not have believed that JPMorgan was required to delay its "claw-back" position for four to ten months, or that JPMorgan was not entitled to rely upon the information it received from Pierce and Charter One. *Rhone–Poulenc*, 616 A.2d at 1196. Under either an "arbitrary and capricious" or *de novo* standard of review, JPMorgan was not required to postpone its "claw-back decision" until Pierce's actual responsibilities were internally resolved at Charter One four to ten months after Pierce resigned from JPMorgan. *Schwartz*, 163 A.2d at 796; *Hall*, 2005 WL 406348, at *4; *Hilton Hotels*, 275 F.Supp.2d at 961, 967–68; *Crider*, 458 F.Supp.2d at 503. The court need not review the record to determine whether Pierce now performs the "same or substantially similar functions" she performed at JPMorgan.

## VI. Contract Language Arguments by Pierce

██ Pierce argues that HR Director Farrell erred by failing to consider certain contractual contingencies. Specifically, Pierce argues that JPMorgan's 2004 merger with Bank One constituted a "change of control" under the first April 30, 1999 Stock Award Agreement, and therefore all stock restrictions, including the non-compete covenant, lapsed. Pierce also maintains that a $53,125.05 stock gain she realized on July 1, 2004 under a February 15, 2000 Restricted Stock Award Agreement was the result of a stock restriction that lapsed on February 15, 2003, more than a year before she left JPMorgan. Pierce continues that some of the Stock Award Agreements required that an employee violate "*the* restrictive covenants" as oppose to "*any of* the restrictive covenants," thus requiring JPMorgan to find the employee

also breached a "confidential information" covenant to support a "claw-back" decision. Pierce maintains that there is no evidence that she signed the last August 18, 2003 Stock Award Agreement, and because she was paid under the Agreement, JPMorgan waived its right to enforce the restrictive covenant.

As previously discussed, the 1999 Plan, the 2001 Plan, and the Stock Award Agreements authorized delegated decision-maker Farrell to interpret the Plans and Stock Award Agreements. JPMorgan's interpretation of the contracts is thus subject to a review for an exercise of good faith and reasonable discretion consistent with the language of the Plans and Stock Award Agreements. *Schwartz*, 163 A.2d at 796; *Hall*, 2005 WL 406348, at *4; *Hilton Hotels*, 275 F.Supp.2d at 961, 967–68.

The April 30, 1999 Stock Award Agreement provides that: "In the event of a change in control (as defined by the Plan) after the date of this award, all restrictions will lapse on the change of control." The Stock Award Agreement also provides under the sub-title "Lapse of Restrictions":

—One-half of the [stock] grant will be distributed free of restrictions upon the third and fifth anniversaries of the grant, subject to continued employment and subject to restrictive covenants. . . .

Further, "[a]s a condition to a restricted stock grant," employees such as Pierce were required to agree to restrictive covenants, including the covenant of not becoming employed by a competitor and performing the "same or substantially similar functions" as he or she performed at JPMorgan. The 1999 Plan speaks to determinations regarding "the grant terms of Awards including . . . restriction or option period, dividend rights, post-retirement and termination rights . . . and such other

terms and conditions as the Board or the Committee deems appropriate."

A reasonable person in Pierce's position would conclude from this language that the "restrictions" that "lapsed" on a change of control were the restrictions on liquidating a stock grant, not the restrictive covenants. *Rhone–Poulenc*, 616 A.2d at 1196. Stock "restrictions" are referred to separately from "restrictive covenants." The "restrictive covenants" are expressly "a condition to a restrictive stock grant," and raise issues independent of a stock's "restriction or option period." JPMorgan's interpretation that the restrictive covenants did not "lapse" with the 2004 merger of Bank One and JPMorgan is consistent with the unambiguous contract language, and not the result of bad faith or an abuse of discretion. Likewise, although Pierce may have realized a stock gain on July 1, 2004 when restrictions on stock she received under a February 15, 2000 Restricted Stock Award Agreement lapsed, the restrictive covenants did not lapse on July 1, 2004, subjecting this gain to the one-year "claw-back" provisions when she became employed by Charter One in January 2005.

Each of the five Stock Award Agreements contains a "confidential information" restrictive covenant and a "non-compete" restrictive covenant. The April 30, 1999 Stock Award Agreement provides:

> If the employee violates the restrictive covenants above ... the employee will be required to reimburse [JPMorgan]....

The June 22, 2000 Stock Award Agreement provides in contrast:

> If the employee violates any of the restrictive covenants above ... the employee will be required to reimburse [JPMorgan]....

The August 14, 2001 and July 5, 2002 Stock Award Agreements read:

> If an employee ... violates the restrictive covenants described above ... the employee ... will be required to reimburse [JPMorgan]....

The August 18, 2003 Stock Award Agreement states:

> If the employee ... violates any of the restrictive covenants described above ... the employee ... will be required to reimburse [JPMorgan]....

■ A reasonable person in Pierce's position would interpret the language of each of these Stock Award Agreements as requiring the reimbursement of stock option gains to JPMorgan if that person violated only the "non-compete" clause that is the subject of this lawsuit. *Rhone–Poulenc*, 616 A.2d at 1196. Under the circumstances, it would be patently unreasonable to believe that the parties intended that a former JPMorgan employee would suffer no stock option consequence if he or she performed "the same or substantially similar functions" for a JPMorgan competitor "in a manner which is or may reasonably be expected to be prejudicial to or in conflict with JPMorgan" if JPMorgan could not also reasonably conclude that the employee misappropriated confidential information. Pierce herself did not reach the issue of confidential information in recommending a "claw-back" with respect to one Michael Newbold, or in reaching the same "claw-back" conclusion as JPMorgan when she quit. Delaware law will not allow imprecision to alter the plain meaning of a contractual provision or to frustrate the overall plan or scheme as memorialized in a written contract. *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 555–56 (Del.Super.2005), *aff'd*, 886 A.2d 1278 (Del.Supr. Oct.31, 2005) (Table). JPMorgan's interpretation that the restrictive covenants are independent covenants is consistent with the reasonable interpreta-

tion of the contract language, and does not indicate an exercise of bad faith or an abuse of discretion.

Pierce's argument that JPMorgan's lack of proof that she signed the August 18, 2003 Stock Award Agreement demonstrates JPMorgan waived its right to enforce the restrictive covenants therein is not well taken. The standards for finding a waiver of contractual rights under Delaware law are "quite exacting," requiring that the facts relied upon to prove a waiver be unequivocal. *AeroGlobal Capital Management, L.L.C. v. Cirrus Industries, Inc.,* 871 A.2d 428, 444 (Del.Supr.2005). "Waiver is the voluntary and intentional relinquishment of a known right." *Id.* JPMorgan's failure to secure Pierce's signature on the August 18, 2003 Stock Award Agreement does not unequivocally prove that JPMorgan awarded Pierce lucrative stock options that would vest under the terms of the Stock Award Agreement while intending that Pierce would not be bound by other contractual terms such as the restrictive covenants. Pierce's acceptance of the gains earned under the terms of the August 18, 2003 Stock Award Agreement constitutes substantial evidence that JPMorgan and Pierce intended that the restrictive covenants would apply. *See Quillen v. Sayers,* 482 A.2d 744, 747 (Del.Supr.1984) (recognizing that, in the absence of a signed written contract, acts of partial performance constitute substantial evidence that a contract exists). Pierce's argument that the absence of her signature rendered the contract "null and void" fails to address her own substantial performance in accepting the award, and is not well taken. Pierce has failed to proffer requisite unequivocal evidence that JPMorgan voluntarily and intentionally waived its right to enforce the restrictive covenants. *AeroGlobal Capital Management,* 871 A.2d at 444; *First Nat'l Bank,* 391 U.S. at 270, 88 S.Ct. 1575; *McLean,* 224 F.3d at 800.

JPMorgan's interpretation of the contracts is consistent with the language of the Plans and Stock Award Agreements and the product of an exercise of good faith and reasonable discretion. *Schwartz,* 163 A.2d at 796; *Hall,* 2005 WL 406348, at *4; *Hilton Hotels,* 275 F.Supp.2d at 961, 967–68. Alternatively, taking a "fresh look" at the parties' contract and the surrounding circumstances, the court is persuaded JPMorgan was correct in its interpretation of the parties' contract. *Crider,* 458 F.Supp.2d at 503.

### VII. Conclusion

Pierce does not dispute JPMorgan's claim of $376,348.59 in liquidated damages. Upon reviewing the record under Delaware law, there is no reasonable dispute that JPMorgan is entitled to judgment on its breach of contract claim as a matter of law. *Redding,* 241 F.3d at 532. JPMorgan's motion for summary judgment is hereby GRANTED. Sandra Pierce's motion for summary judgment is hereby DENIED. Judgment shall enter in favor of JPMorgan, and against Sandra Pierce, in the amount of $376,348.59.

SO ORDERED.